SPRINGMAN PAPER PRODUCTS CO. *v.* DETROIT IGNITION CO.

1. APPEAL AND ERROR—EVIDENCE—DIRECTED VERDICT.

On reviewing a judgment entered on a directed verdict, the evidence must be viewed in the light most favorable to appellant.[1]

2. FRAUD—FALSE REPRESENTATIONS — EVIDENCE PRESENTED QUESTION OF FACT.

In an action for fraud based on false representations which plaintiff alleged induced him to accept the note of a domestic corporation in lieu of a claim against a foreign corporation, whether false statements made by the president of both corporations and announced in the prospectus of the domestic corporation, a copy of which was sent to plaintiff, as worded and in the connection used were intended to deceive, naturally tended to and did deceive plaintiff and fraudulently induced him to authorize the substitution of debtors, were questions for the jury.[2]

3. CORPORATIONS — FRAUD — DIRECTORS LIABLE FOR FALSE STATEMENTS IN PROSPECTUS.

Directors of a corporation which published a prospectus containing false statements may not claim immunity from liability therefor because they were not shown to have personally participated in its issue, since they are presumed to have knowledge of its business and to direct its policy.[3]

4. DAMAGES—NOMINAL DAMAGES—DIRECTED VERDICT.

Where, in an action for fraud, plaintiff's testimony was sufficient to carry to the jury the question as to whether its legal rights had been violated by false and fraudulent representations, the trial court was in error in directing a verdict for defendants, since, if verdict was for plaintiff, it was entitled to at least nominal damages.[4]

Error to Wayne; Miller (Guy A.), J.     Submitted

[1]Appeal and Error, 4 C. J. § 2709; [2]Fraud, 27 C. J. §§ 214, 215, 216, 217; [3]Corporations, 14a C. J. § 1962; [4]Damages, 17 C. J. § 59; Fraud, 27 C. J. §§ 208, 227; 1 L. R. A. (N. S.) 258; 12 R. C. L. 367.

October 7, 1925.    (Docket No. 8.)    Decided October 4, 1926.

Case by the Springman Paper Products Company against the Detroit Ignition Company and others for fraud.   Judgment for defendants on a directed verdict.   Plaintiff brings error.   Reversed.

*William J. Griffin,* for appellant.

*Armstrong & Mead,* for appellees.

STEERE, J.    This is a fraud action in trespass for damages not to exceed $1,500.   The claim of fraud is based on false representations made by defendants which induced plaintiff to accept the following note in lieu of a claim against a foreign corporation located in Toledo, Ohio, known as the Myers Spark Plug Company:

"Detroit, Mich., Aug. 1st, 1921.
"Six months after date we promise to pay to the order of Springman Paper Products Co., One Thousand Ninety-five and 80/100 Dollars, payable at Detroit, Mich., Detroit Savings Bank.    Value received with six per cent. interest per annum.
"No.............. Due Feb. 1st, 1922.
                              "DETROIT IGNITION COMPANY,
                                    "CHAS. F. LAFOND,
                                              President."

Plaintiff is a domestic corporation located in Detroit, Michigan, engaged in manufacturing gaskets, cartons, show cards, etc.    In December, 1920, it sold a quantity of cartons and cards to the Myers Spark Plug Company, its bill therefor amounting to some $1,300.    There yet remained past due and unpaid $1,095.80, when plaintiff accepted from the Myers Spark Plug Company two notes, one for $500 dated March 21, 1921, and one for $595.80 dated March 25, 1921, each maturing 30 days after date.    These notes

were defaulted when due and protested for nonpayment.

In an endeavor to collect the same, plaintiff's treasurer, Otto E. Werner, made demand upon the Myers Spark Plug Company and was told at its office that defendant LaFond, who had an office in Detroit, was an officer of the company and Werner was referred to him. Upon his interviewing LaFond in Detroit the latter told him that they proposed to form a new company to be called the Detroit Ignition Company to take over the assets of the Myers Spark Plug Company,—

"and after everything was in proper shape he was going to give notes until such time as they could pay it with the stock of the Detroit Ignition Company * * * that they would give us a note for our account which would give them a chance to dispose of stock so that they could make payment at maturity."

Werner communicated what LaFond had told him to Charles T. Springman, plaintiff's president. Apparently some communication on the subject was then sent to the Myers Spark Plug Company as plaintiff received a letter, dated June 3, 1921, from that company signed by LaFond as its president, which, omitting formal parts, is as follows:

"We thank you for your letter of May 25th.

"The final stockholders' meeting was held in Toledo, Tuesday, June 1st, at which time the reorganization plan was approved.

"We are now ready to sell enough stock to put this company in a strong financial position.

"You realize, however, that selling stock under present conditions is a hard job and delay is positively unavoidable.

"The plan calls for payment in full of all accounts just as soon as the money is received for the sale of stock and you can rest assured this will be done."

Not long before August 1, 1921, plaintiff received a prospectus of the Detroit Ignition Company which

was of the same import as the statements LaFond had made to Werner and Werner had communicated to Springman.   On the strength of these representations plaintiff claims it was induced to accept the above-quoted note in lieu of its two notes given by the Myers Spark Plug Company for $1,095.80.

Springman testified that he did not instruct Werner to accept the note until after he had read the Detroit Ignition Company's prospectus; that he was induced to accept the same for his company in lieu of the notes against the Myers Spark Plug Company by the prospectus and the conversation Werner had with LaFond as communicated to him, which "was practically the same wording as was in the circular."   Asked what particular thing in the circular induced him to make the exchange, he said:

"*A.* This part where they stated they had assets or they had sold outstanding stock of one hundred thirty and some odd thousand dollars.    I took that as a basis of credit.    I knew there must be something there if they had $134,000 worth of assets.

"*Q.* Any other statement in there that influenced you in any way in your action?

"*A.* Their guaranty that they would put the spark plug across with Mr. MacManus' help in the advertising field.    *    *    *

"When I saw this prospectus I read it over.    I knew what it was.    It is a prospectus for selling stock. I based my claims on approving the note on the claims they made.

"*Q.* You say the inducing cause, the principal thing was that there was outstanding 134,000 shares of stock?

"*A.* Those were their claims.

"*Q.* You relied upon them?

"*A.* I did."

The consummation of these negotiations for novation as testified to by Werner was that after Springman authorized him to accept the Detroit Ignition Company's note, LaFond brought it to him with a short

letter from the Detroit Ignition Company addressed to plaintiff expressive of appreciation, and "told me that all arrangements had been completed. I accepted the note as being all right under these conditions."

At conclusion of the testimony the court granted defendants' motion for a directed verdict, giving as reasons therefor, briefly stated, that there was no competent proof connecting defendants Starkweather, Lehr, and Turrell with the alleged false representations upon which plaintiff claimed to have relied; and as to all the defendants plaintiff had failed to produce definite proof of any damages or establish by its testimony any reasonable basis for fixing the damages it claimed.

The Myers Spark Plug Company was organized in 1917 and incorporated in 1919. It owned the patents for its spark plug, and for over four years occupied rented quarters in Toledo, making its spark plugs, or having them made, of standard size to fit automobiles, trucks, etc., in general use and in marketing them to the extent that it was able. Although defendant's prospectus asserted that during those four years "a positive demand has been created for Myers Self Cleaning Spark Plugs in every State in the Union," its financial condition at the time it ceased business indicates a negative result as to profits.

How long or to what extent LaFond was interested in that company does not appear, but at the time it ceased business he was its president, as shown by his letter to plaintiff of June 3, 1921. The scheme for "re-organization" and re-financing apparently originated with and was engineered by him. As a part of the plan there was a preliminary subscription for 1,000 shares of stock in the Detroit Ignition Company, which was incorporated under the laws of Delaware on April 30, 1921, and he became its president. Application was made to the Michigan securities commission, in May, 1921, for authority to sell its stock

and permission was granted, as testified to by defendant Lehr, who did the legal work in organizing that corporation and was its secretary.    A block of 80,000 shares of the company's stock was issued to LaFond, and escrowed by him with the securities commission when applying for authority to put its stock on the market.    What showing was made before the commission is not disclosed but no advertising matter was then filed with it.

Under their plan of corporate translation about 54,000 shares of the Detroit Ignition Company's stock were to go to the stockholders of the Myers Spark Plug Company, exclusive of Mr. Myers himself.    That stock was written up by the secretary in the stock book of the Detroit Ignition Company which was in the possession of LaFond, but the certificates were never taken out of the book or delivered.    LaFond paid Myers $14,000 for 80,000 shares of stock he would be entitled to in the Detroit Ignition Company, and Myers was to trade the rest of his interest in the Myers Spark Plug Company for stock in the Detroit Ignition Company.

The prospectus was issued by the Detroit Ignition Company after the meeting between Werner and LaFond.    Following its receipt, Springman authorized Werner to make the exchange of notes.    It contains six pages in addition to the front and back cover pages.    The front cover page states the Detroit Ignition Company is a Delaware corporation having its general office in the "Detroit Savings Bank Building, Detroit, Michigan, U. S. A."

Page 1 states it has a capitalization of "300,000 Shares Common Stock, Par Value $1.00 Per Share. Outstanding, 134,175 shares."    It names as its officers defendants LaFond, president; Starkweather, vice-president; Lehr, secretary, and Turrell, treasurer, and includes defendant Anderson with them in its list of directors.

On page 2 it states in part:

"The Detroit Ignition Company has purchased the entire assets, good will, copyrights and patents of the Myers Spark Plug Company of Toledo, Ohio, organized in 1917, and incorporated in May, 1919."

The balance of this page is devoted to laudatory statements beginning:

"The Myers Self Cleaning Spark Plug is the only positive and practical self cleaning plug made in the world to-day."

And ending:

"The Myers Self Cleaning Spark Plug has been manufactured and marketed successfully, but not intensively, for four years."

On page 3 it is said:

"The Detroit Ignition Company will move the plant to Detroit, the home of automobiles, and will manufacture and aggressively sell, through responsible jobbers, Myers Self Cleaning Spark Plugs in an intensified and forceful manner.   Our product lends itself wonderfully to advertising force, and we hope to make Myers Self Cleaning Spark Plugs as popular, through the efforts of MacManus, Incorporated, as Boston Garters, Salada Tea, Ivory Soap, Spearmint Gum, O'Sullivan Heels and other advertising successes. *   *   * All parts are purchased from specialists in their construction, and the assembling process is unique in its speed and simplicity.   As we do not manufacture any of the parts, no expensive or special machinery will be necessary for that purpose. *   *   * We are therefore going into a potential market of 100 million $1.00 units, with the only practical, tested, and approved Self Cleaning Spark Plug."

The rest of the prospectus is devoted to descriptions, photographs and copies of commendatory letters and telegrams claimed to have been received lauding its spark plug.

Its "Summary" reads in part as follows:

"The Detroit Ignition Company is developing a simple, conservative, yet positive manufacturing enterprise, making and selling a $1.00 article with a constant and positive demand of 100,000,000 such articles per year.

"By manufacturing this article in Detroit, the company has the distinct advantage of making and marketing a spark plug with Detroit's backing, the automobile city of the world."

Even with "Detroit's backing" and "MacManus' help in the advertising field" as above illustrated, the promotion proved a failure. So far as this record indicates the Detroit Ignition Company never manufactured, assembled, or sold a Myers Self Cleaning Spark Plug, and at the time of this trial its artificial personality had vanished by dissolution proceedings. Neither did it ever actually acquire the patent, copyrights or "entire assets" of the Myers Spark Plug Company.

The Myers Spark Plug Company is not shown to have ended its corporate existence by dissolution. It is, or was, a foreign corporation, located and operating in another State, and, whatever its resources or liabilities, it is no longer a debtor of plaintiff by reason of the novation which substituted the Detroit Ignition Company as the debtor and released it from the obligation involved here. But it had other obligations and it was disclosed that its tangible assets had been taken possession of by its landlord, the Reliable Tool & Machine Company, as to which the Detroit Ignition Company's secretary testified, when called for cross-examination under the statute, in part as follows:

"We never did get possession of the assets. * * * We could not get enough money to pay any claims except Mr. LaFond. * * * There were no assets to be used for the payment of debts. We never obtained possession of the tangible assets and the patent, which was the chief object of value, had never been assigned."

236—Mich.—7.

And yet the president of both corporations, who may at least be presumed to know something of the situation, told plaintiff, and the Detroit Ignition Company announced in its prospectus, a copy of which plaintiff received through the mail, that it had then purchased the entire assets, good will, copyrights, and patents of the Myers Spark Plug Company of Toledo, Ohio, and had already auspiciously progressed so far in its project to supply a waiting world from Detroit with the only practical self cleaning spark plug made in it, that 134,175 shares of its 300,000 shares, with a par value of $1 per share, were outstanding.

As presented here we find no occasion to review defendants' contention and authorities upon the proposition that the 54,000 shares for which stock certificates had been written up in the certificate book but not delivered were technically issued and outstanding. A verdict was directed for defendants, as to which the rule is well settled that the evidence must be viewed in the light most favorable to plaintiff. So viewed, it was for the jury to determine under proper instructions whether those statements of fact as worded and in the connection used were intended to deceive, naturally tended to and did deceive plaintiff's president as to the Detroit Ignition Company's financial stability and fraudulently induced him to authorize its substitution as a debtor.

As to the directors against whom the court held there was no evidence of participation or guilty knowledge, lest silence might be taken as ratification of that ruling, it may be said in passing there is positive testimony that the prospectus "was published by the Detroit Ignition Company." It gave the names of those defendants as directors of the company. As its directors, they are presumed to have knowledge of its business and direct its policy. If they knew, ought to have known, or by the exercise of ordinary diligence in their official positions might have known of the

publication of this prospectus and its contents, they are not necessarily immune because not shown to have personally participated in its issue.

The primary issue in this case was the charged false and fraudulent representations, or tortious violation of plaintiff's legal rights. Plaintiff's testimony being sufficient to carry that issue to the jury, as the trial court rightly intimated, the court could not direct a verdict for defendants, but at most might instruct the jury that if its verdict was for plaintiff on that issue only nominal damages could be awarded.

"The principle that for the violation of every legal right nominal damages at least will be allowed applies to all actions, whether for tort or breach of contract, and whether the right is personal or relates to property." 1 Sutherland on Damages (4th Ed.), p. 36.

Whether there was *prima facie* proof of more than nominal damages for the jury, as plaintiff asserts, need not be discussed, but its contention that it was at least entitled to nominal damages if it proved the tort charged is well founded.

The judgment is reversed, with costs to plaintiff, and a new trial granted.

BIRD, C. J., and SHARPE, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.

Justice MOORE took no part in this decision.